# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTHERN TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| CITY OF FORT WORTH, | Civil Action No. _____ |
| Plaintiff, | |
| *v.* | |
| UNITED STATES; DEPARTMENT OF DEFENSE; DEPARTMENT OF THE AIR FORCE; DEPARTMENT OF THE NAVY; 3M COMPANY (f/k/a Minnesota Mining Manufacturing, Co.); AGC, INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT GMBH; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; EIDP, INC. (f/k/a E.I. du Pont de Nemours and Company); FIRE SERVICE PLUS, INC.; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; PERIMETER SOLUTIONS LP; RTX CORPORATION (f/k/a Raytheon Technologies Corporation); and TYCO FIRE PRODUCTS LP. | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

# TABLE OF CONTENTS

I.    SUMMARY OF CLAIM ...................................................................................... 1

II.   JURISDICTION AND VENUE ........................................................................... 3

III.  PLAINTIFF ......................................................................................................... 4

IV.   DEFENDANTS ................................................................................................... 5

V.    FACTUAL ALLEGATIONS ............................................................................. 10

   A.   PFAS pose a threat to human health and the environment. .................................. 10

   B.   Since the late 1940s, PFAS-containing products made and sold by Manufacturer Defendants have contaminated the environment. ................................................................................. 13

   C.   Since the 1960s, AFFF has been used and released into the environment. .......................... 15

   D.   Manufacturer Defendants supplied AFFF to DOD............................................ 16

   E.   Defendants knew and failed to provide notice that PFAS and PFAS-containing products are toxic. ............................................................................................................................ 21

   F.   DOD used and released AFFF at Carswell Air Force Base and NAS JRB Fort Worth. ...... 28

   G.   Air Force Plant 4 is an additional source of PFAS released into the City's Property. ......... 37

   H.   The discretionary-function exception does not apply to the City's FTCA claims. .............. 40

   I.   The City has been damaged by Defendants' actions, and that damage is ongoing. ............. 43

VI.   CAUSES OF ACTION ....................................................................................... 44

VII.  PRAYER FOR RELIEF ..................................................................................... 65

VIII. DEMAND FOR JURY TRIAL .......................................................................... 67

The City of Fort Worth ("City"), by and through its attorneys, hereby alleges as follows:

## I.    SUMMARY OF CLAIM

1.    The City brings this action for damages and reimbursement of costs incurred and that continue to be incurred to address the presence of per- and polyfluoroalkyl substances ("PFAS")—including, but not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS")—in the City's drinking water sources, water rights, storm- and wastewater infrastructure, and real property ("City's Property").

2.    PFAS, including PFOA and PFOS, are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFAS can cause serious health impacts.

3.    The 3M Company, AGC, Inc. (f/k/a Asahi Glass Co., Ltd.); AGC Chemicals Americas, Inc.; Amerex Corporation; Archroma Management GmbH; Archroma U.S., Inc.; Arkema, Inc.; BASF Corporation; Buckeye Fire Equipment Company; Carrier Global Corporation; ChemDesign Products, Inc.; Chemguard, Inc.; Chemicals Incorporated; The Chemours Company FC, LLC; The Chemours Company; Clariant Corporation; Corteva, Inc.; Daikin America, Inc.; Dupont de Nemours, Inc.; Deepwater Chemicals, Inc.; Dynax Corporation; E.I. du Pont de Nemours & Co.; Fire Service Plus, Inc.; Kidde PLC, Inc.; Nation Ford Chemical Company; National Foam, Inc.; Perimeter Solutions LP; RTX Corporation (f/k/a Raytheon Technologies Corporation); and Tyco Fire Products LP (together, the "Manufacturer Defendants"), are responsible for PFAS released on or into the City's Property.

4.    For years, Manufacturer Defendants manufactured, sold, and/or distributed compounds and products containing PFAS. These products include the firefighting suppressant agent "aqueous film-forming foam" ("AFFF"), which contains PFAS and is used at airports and

military facilities.[1] Their customers included the United States, Department of Defense, Department of the Navy, and Department of the Air Force ("Federal Defendants"), as well as Lockheed Martin and its predecessors in interest. Specifically, 3M Company; Amerex Corporation; Buckeye Fire Equipment; Carrier Global Corporation; Chemguard, Inc.; Fire Service Plus, Inc.; Kidde PLC, Inc.; National Foam, Inc.; Perimeter Solutions LP; RTX Corporation; Tyco Fire Products LP; and/or their subsidiaries (collectively, "AFFF Manufacturer Defendants") developed, manufactured, marketed, distributed, and/or sold AFFF, among other products-containing PFAS. The remaining Manufacturer Defendants manufactured, marketed, distributed, and/or sold PFAS as constituents of AFFF or other products.

5.      Manufacturer Defendants knew that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment. Yet they manufactured, distributed, and sold these chemicals and products containing these chemicals with inadequate warning of their toxic effects. They did so without regard to the health of the City's residents or the City's property interests, both of which would foreseeably be damaged once these chemicals infiltrated the environment.

6.      Manufacturer Defendants marketed, distributed, and sold their AFFF with knowledge that it would be used in training exercises, fire control, fire suppression systems, emergency situations, and other ways at Air Force and Navy bases such as Naval Air Station Joint Reserve Base Fort Worth ("NAS JRB Fort Worth"), formerly known as Carswell Air Force Base, and industrial sites like Air Force Plant 4 ("AFP4"), operated at all relevant times by Lockheed Martin Corporation and its predecessors in interest.

---

[1] Unless otherwise apparent from context, all mentions of "AFFF" refer to AFFF containing PFAS and include the PFAS components of AFFF.

7.    Manufacturer Defendants knew such use would release PFAS and other contaminants into the environment.

8.    Manufacturer Defendants' negligent development, manufacturing, distribution, marketing, and/or sale of AFFF caused the contamination of the City's Property with PFAS.

9.    Some Manufacturer Defendants manufactured, distributed, and/or sold PFAS as part of other products containing PFAS or for inclusion in such products. PFAS from these products foreseeably entered drinking water supplies at the end of the products' life cycles.

10.    Likewise, Federal Defendants' uncontrolled release of AFFF onto the City's Property caused the City to incur and continue to incur response costs.

11.    As a result of Defendants' contamination, the City has incurred and will continue to incur significant expenses and losses associated with continued water quality testing, designing and constructing filtration systems, operating and maintaining such systems, and otherwise responding to and mitigating the impacts of PFAS contamination in the City's Property.

## II.    JURISDICTION AND VENUE

12.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 to hear the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claims set forth in this Complaint under Section 107 of CERCLA, 42 U.S.C. § 9607(a).

13.    This Court has jurisdiction to hear the City's tort claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1). On July 23, 2024, the City submitted an administrative claim to Federal Defendants by certified mail, priority mail, and email for damages pursuant to the FTCA, 28 U.S.C. §§ 1346, 2671, 2674, *et seq*. Federal Defendants each received the administrative claim on or before July 31, 2024. The Air Force acknowledged receipt as the lead agency in a letter dated July 31, 2024, but it did not communicate

a final disposition of the administrative claim within the six-month period allotted under 28 U.S.C. § 2675(a), which expired on or before January 31, 2025.

14.     This Court has supplemental jurisdiction over the City's state law claims under 28 U.S.C. § 1367.

15.     The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

16.     Federal Defendants have waived their sovereign immunity to cost-recovery claims pursuant to CERCLA § 120(a), 42 U.S.C. § 9620(a).

17.     For purposes of the claims alleged herein and Case Management Order No. 3 of the AFFF MDL, No. 2:18-mn-2873-RMG, the Northern District of Texas shall be the City's home venue, defined as the proper venue of origin where the claim could have otherwise been brought under 28 U.S.C. § 1391, because it is the judicial district in which the City is a resident and citizen, in which a substantial part of the events giving rise to this Complaint occurred, and in which a substantial part of the events or omissions giving rise to this action occurred.

### III.    PLAINTIFF

18.     Plaintiff City of Fort Worth is a municipal corporation with its principal place of business at 200 Texas Street, Fort Worth, Texas 76102.

19.     The City is a municipal water purveyor with municipal water rights issued by the Texas Commission on Environmental Quality. The City supplies drinking water to approximately 1.4 million customers through an interconnected water supply and distribution system.

20.     The City's water is drawn from several surface water sources: Lake Worth, Eagle Mountain Lake, Richland Chambers Reservoir, Cedar Creek Reservoir, Lake Benbrook, and the Clear Fork Trinity River. The City owns and operates Lake Worth. The City obtains from the

Tarrant Regional Water District raw water drawn from the remaining surface water sources. The City also operates the Village Creek Water Reclamation Facility, which serves most of the City and 23 surrounding communities, and a separate storm sewer system.

## IV.    DEFENDANTS

21.    Defendant the United States is a sovereign nation and national government and maintains offices at the offices of the President at the White House, 1600 Pennsylvania Avenue, Washington, D.C. 20500. The FTCA claims herein are directed against the United States only. The other Federal Defendants are named specifically for purposes of non-FTCA claims.

22.    Defendant Department of Defense ("DOD") is a federal agency that maintains offices at 1000 Defense Pentagon, Washington, D.C. 20301-1000.

23.    Defendant Department of the Air Force is a federal agency that maintains offices at 1670 Air Force Pentagon, Washington, D.C. 20330-1670.

24.    Defendant Department of the Navy is a federal agency that maintains offices at 1000 Navy Pentagon, Washington, D.C. 20350-1200.

25.    Defendant The 3M Company ("3M") (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation. Its principal place of business is at 3M Center, St. Paul, Minnesota 55144-1000.[2]

26.    Defendant AGC, Inc. ("AGC") (f/k/a Asahi Glass Company, Ltd.) is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

27.    Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware

_____

[2] The City successfully opted out of the 3M Settlement Agreement (Dkt. 3793-2) and therefore did not release any claims against 3M.

corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

28.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal business office at 7595 Gadsen Highway, Trussville, AL 35173.

29.     Defendant Archroma Management GmbH ("Archroma Management") is a foreign limited liability company registered in Switzerland, with a principal business address of Hardstrasse 1, 4133 Pratteln, Basel-Land, Switzerland.

30.     Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Archroma U.S., Inc. is a subsidiary of Archroma Management.

31.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406.

32.     Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF previously acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

33.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

34.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida

33418. Carrier Fire & Security Americas Corporation is a division of Carrier.[3]

35.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

36.    Defendant Chemguard, Inc. ("Chemguard") is a Delaware corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Chemguard previously acquired Williams Fire and Hazard Control, Inc. which has sold and/or distributed AFFF throughout the United States.

37.    Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

38.    Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. On information and belief, Chemours is a successor-in-interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), which was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

39.    Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware 19899.

40.    Defendant Clariant Corporation ("Clariant") is a New York corporation with its

---

[3] Stay and injunction orders entered in the Kidde-Fenwal, Inc. bankruptcy adversary proceeding permit a plaintiff to file and serve a complaint or amended complaint against Defendants Carrier Global Corporation, Kidde PLC, Inc., National Foam, Inc., and RTX Corporation, as necessary to protect a plaintiff's rights regarding timeliness arguments. *Kidde-Fenwal Inc. v. Those Parties Listed on Exhibit A to Adversary Complaint and Jane and John Does 1-1000*, Adv. Case No. 23-50387 (LSS) (Bankr. D. Del.), Adv. D.I. Nos. 69 at 6, 82 at 2, 91 at 2, 100 at 3. Accordingly, the City's claims against those Defendants are not prohibited by the stay and injunction set out in those orders.

principal place of business located at 500 E. Morehead Street, Charlotte, North Carolina 28202.

41.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 9330 Zionsville Road, Indianapolis, IN 46268. Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont.

42.    Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation with its principal place of business located at 20 Olympic Drive, Orangeburg, New York 10962.

43.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

44.    Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc.[4]

45.    Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576.

46.    Defendant EIDP, Inc. ("Old DuPont") (f/k/a E.I. du Pont de Nemours & Co.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. On information and belief, Chemours is a successor-in-interest to DuPont Chemical.

47.    In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along

---

[4] The City successfully opted out of the DuPont Settlement Agreement (Dkt. 3393-2) and therefore did not release any claims against the Released Persons under that settlement.

with certain environmental liabilities. At the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

48.     Defendant Fire Service Plus, Inc., is a Georgia corporation with its principal place of business located at 473 Dividend Drive, Peachtree City, Georgia 30269.

49.     Defendant Kidde PLC, Inc. ("Kidde") is a Delaware corporation with its principal place of business at One Carrier Place, Farmington, Connecticut 06034. On information and belief, Kidde was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

50.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

51.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business at 141 Junny Road, Angier, North Carolina 27501. On information and belief, National Foam is the successor-in-interest to Angus Fire Armour Corporation. National Foam is a subsidiary of Angus International Safety Group, Ltd. National Foam manufactures the Angus brand of AFFF products.

52.     Defendant Perimeter Solutions LP is a Delaware corporation with its principal place of business at 8000 Maryland Avenue, Suite 350, Clayton, Missouri 63105. On information and belief, Perimeter Solutions purchased The Solberg Company (Solberg) products division of Amerex Corporation and is a successor in interest to Solberg.

53.     Defendant RTX Corporation is a Delaware corporation with its principal place of business at 1000 Wilson Boulevard, Arlington, VA 22209.

54.     Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with

its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. On information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul"). On information and belief, Tyco's governing partners are citizens of Florida, Pennsylvania, and Delaware. Tyco acquired Chemguard in 2011.

55.    The City has accepted the Tyco Settlement Agreement (Dkt. 5053-3) and BASF Settlement Agreement (Dkt. 4911-3). Accordingly, notwithstanding any other allegation, the City does not assert any Released Claims against Defendants that are Released Parties in those settlements—Tyco, Chemguard, ChemDesign, and BASF. This Complaint should be construed to assert claims against such Released Parties only insofar as such claims have not been released by said settlement agreements (*e.g.*, for wastewater-related damages).

## V.    FACTUAL ALLEGATIONS

### A. PFAS pose a threat to human health and the environment.

56.    PFAS are a family of synthetic chemicals containing fluorine and carbon atoms. As used in this Complaint, the term "PFAS" includes all PFAS that have been or may be detected in the City's Property, including, *inter alia*, PFOA, PFOS, perfluorononanoic acid ("PFNA"), perfluorohexane sulfonic acid ("PFHxS"), and perfluorobutanesulfonic acid ("PFBS").

57.    PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid. For this reason, they are effective in products requiring fire resistance or oil, stain, grease, and water repellency.

58.    PFAS are in many products, including, but not limited to: firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

59.    PFAS are not naturally occurring. Thus, any PFAS detected in the environment and in humans are attributable to human activity.

- 10 -

60.     Hundreds of PFAS have been manufactured, distributed, and sold in the United States.

61.     The two most widely known and studied PFAS are PFOA and PFOS.

62.     Due to their chemical structure, PFAS do not normally hydrolyze, photolyze, or biodegrade under environmental conditions, and are extremely persistent in the environment and in human tissue.

63.     PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

64.     Studies have shown that PFAS bioaccumulate and biomagnify in humans and wildlife.

65.     Specifically, humans may absorb PFAS from drinking water. PFAS accumulate primarily in the blood stream, kidneys, and liver.

66.     In 2009, EPA issued Provisional Health Advisories "to assess potential risk from exposure to [PFOS and PFOA] through drinking water," setting provisional lifetime health advisory levels of 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. No sampling was required until 2012.

67.     In May 2016, EPA issued lower health advisories for PFOA and PFOS warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses risks of adverse human health effects.

68.     In June 2022, EPA established dramatically lower drinking water health advisory limits for PFOA and PFOS at .004 and .02 ppt, respectively. At the same time, EPA created two additional Health Advisories for GenX and PFBS at 10 and 2,000 ppt respectively.

69.     In January 2024, EPA proposed to list nine PFAS, including PFOA and PFOS, as

hazardous constituents under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*., enabling EPA to require investigation and cleanup of these PFAS at facilities that treat, store, or dispose of hazardous wastes. EPA also proposed to expand the agency's authority in a way that would allow it to address thousands of other PFAS that have not formally been found to be hazardous.

70.     In April 2024, EPA finalized maximum contaminant levels ("MCLs") under the federal Safe Drinking Water Act ("SDWA") for PFOA and PFOS of 4 ppt each and for PFHxS, PFNA, and HFPO-DA ("GenX") at 10 ppt each; it is also regulating mixtures of PFNA, PFHxS, PFBS, and/or GenX under a unitless threshold called a "Hazard Index," based on the combined concentrations of those four PFAS.

71.     In April 2024, EPA designated PFOA and PFOS as hazardous substances under CERCLA. EPA is also considering whether to designate several other PFAS and/or entire categories of PFAS as hazardous substances under CERCLA.

72.     These EPA actions are predicated in part on studies completed on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Public Health Service, and the U.S. Department of Health and Human Services, which show that PFAS, including PFOA and PFOS, may adversely affect human health and the environment.

73.     For example: on June 20, 2018, the ATSDR and the U.S. Department of Health and Human Services released a draft toxicological profile for perfluoroalkyls for public comment ("2018 ATSDR Toxics Profile").

74.     The 2018 ATSDR Toxics Profile was prepared pursuant to CERCLA § 104(i), 42 U.S.C. § 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS. In it, ATSDR set provisional minimal risk levels for the PFAS analyzed. It concluded that several have

long half-lives in humans, and that PFAS exposure can cause several adverse health outcomes.

75.    The 2018 ATSDR Toxics Profile explains that "EPA (2016e, 2016f) has concluded that there is suggestive evidence of the carcinogenic potential of PFOA and PFOS in humans. [The International Agency for Research on Cancer] . . . (2017) concluded that PFOA is possibly carcinogenic to humans (Group 2B)."

76.    Additionally, nonhuman receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem): elevated mortality in unexposed progeny of freshwater macroinvertebrates with exposure in the parental generation, disruption of the endocrine system in wildlife, and liver toxicity.

77.    PFOA is also readily taken up by plants, including wild plants and crops that are grown on contaminated soil, and lead to further bioaccumulation in the food chain.

**B.    Since the late 1940s, PFAS-containing products made and sold by Manufacturer Defendants have contaminated the environment.**

78.    Beginning in the 1950s, manufacturers began incorporating PFAS into consumer products.

79.    Starting in the late 1940s, Old DuPont began producing polytetrafluoroethylene, commonly known as Teflon, and including it in consumer products like non-stick pans, cosmetics, and stain-resistant carpet treatments. For decades, Old DuPont used PFOA to produce polytetrafluoroethylene.

80.     In the 1960s, Old DuPont began manufacturing and selling a wax-paper food packaging calling Zonyl that contained PFAS.

81.     In 1956, 3M began selling Scotchgard, a stain repellent and durable water repellent designed to be applied to textiles that used PFOS and later PFBS as its primary active ingredients.

82.     Starting in 1965, Arkema or its predecessors in interest manufactured and sold Kynar polyvinylidene fluoride resins and copolymers, which contain or were made using PFAS during the manufacturing process. These products were used in many applications, including construction, batteries, semiconductors, energy production, and biopharmaceuticals.

83.     In the 1970s, AGC and AGC Chemicals Americas developed and began to sell AsahiGuard, a PFAS-based water and oil repellent used in applications like paper packaging, apparel, medical products, leather, and home furnishings.

84.     In 1991, Daikin began manufacturing and selling a carpet treatment product called Unidyne containing PFAS, which was used in major carpet brands like Mohawk.

85.     Chemguard produced and sold PFAS for incorporation into paints, wood stains and sealers, adhesives, waxes, polishes, cleaners, metal plating, polishes, inks, and more.

86.     Clariant produced and sold a PFAS-based fabric treatment called Nuva, in addition to PFAS-based waxes and food packaging products. On information and belief, after 2013 Archroma Management and/or Archroma U.S. obtained the rights to manufacture and sell some or all of these products, also assuming associated liabilities.

87.     On information and belief, Manufacturer Defendants manufactured, distributed, and/or sold PFAS as part of other PFAS-containing products or for inclusion in such products.

88.     At the end of their life cycles, products containing PFAS end up in landfills and wastewater treatment plants. Through mechanisms including but not limited to landfill leachate and

wastewater plant discharges, PFAS from these consumer products ultimately infiltrate ground and surface water.

89.     The City's Property has been contaminated by PFAS originating from Manufacturer Defendants' operations involving PFAS-containing products.

**C.  Since the 1960s, AFFF has been used and released into the environment.**

90.     In or about 1966, the United States patented AFFF as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

91.     In 1969, by command of the Navy Department and Marine Corps, DOD issued military specification MIL-F-24385 (amended subsequently), requiring AFFF liquid concentrate to contain either 3% or 6% PFAS. In MIL-F-24385, DOD refers to 3% AFFF concentrate as "Type 3" and to 6% AFFF concentrate as "Type 6."

92.     In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water (either 97% or 94%, respectively). AFFF concentrates contain about 60–90% water and have a fluorine content of about 0.3–1.8%.

93.     AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations and civilian airports in the United States, including NAS JRB Fort Worth.

94.     AFFF concentrate containing PFAS is stored in above-ground storage tanks, underground storage tanks, and nonstationary containers. To use AFFF stored in this manner, the concentrate is mixed with water to make a liquid foam solution. The foam solution is then aerated at the nozzle, yielding finished foam that is then ready to be applied to a fire.

95.     AFFF is designed to coat the fire, blocking its oxygen supply and creating a barrier

to extinguish vapors. A film also forms to smother the fire after the foam has dissipated.

96.    Thousands of gallons of foam solution may be applied during a single AFFF release or discharge.

97.    AFFF has been released into the environment, including at NAS JRB Fort Worth, through a variety of practices and mechanisms including: low volume releases of foam concentrate during storage, transfer, or equipment calibration; moderate volume discharge of foam solution for apparatus testing; high-volume, broadcast discharge of foam solution for fire training, fighting, suppression and prevention; and leaks from foam distribution piping between storage and pumping locations.

98.    Safety Data Sheets ("SDSs") (f/k/a Material Safety Data Sheets ("MSDSs")) require that, after AFFF foam is released, spilled, discharged, or disposed into the environment, it must be contained so it does not accumulate in sediment, soil, surface water, sewers, or groundwater.

99.    If it is not contained, AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, surface water, sewers, and groundwater.

**D. Manufacturer Defendants supplied AFFF to DOD.**

100.    Since the 1960s, Manufacturer Defendants coordinated with DOD to develop AFFF meeting MIL-F-24385 specifications to extinguish fires at military bases, airports, oil refineries, and firefighting training facilities throughout the United States.

101.    Defendant 3M does business throughout the United States, including in Texas. It developed, designed, manufactured, marketed, sold, and distributed AFFF from approximately 1964 through at least 2002. The Air Force purchased 3M's AFFF and used it for fire training and response at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

102.     Between 2000 and 2002, Defendant 3M voluntarily phased out its production of some but not all PFAS, but it sold AFFF containing PFOS for many years longer.

103.     Defendant AGC does business throughout the United States, including in Texas. AGC designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

104.     Defendant AGC America does business throughout the United States, including in Texas. AGC America designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

105.     Defendant Amerex does business throughout the United States, including in Texas. Amerex designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

106.     Defendant Archroma Management does business throughout the United States, including in Texas. Archroma Management designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

107.     Defendant Archroma U.S. does business throughout the United States, including in Texas. Archroma U.S. designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

108.     Defendant Arkema does business throughout the United States, including in Texas. Arkema designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

109.     Defendant BASF does business throughout the United States, including in Texas. BASF designed, manufactured, marketed, and sold AFFF that was used at military bases and other

locations throughout the country, including NAS JRB Fort Worth and AFP4.

110.    Defendant Buckeye does business throughout the United States, including in Texas. From approximately 2003 through the present, Buckeye designed, manufactured, marketed, and sold AFFF to military bases and other entities throughout the country, including NAS JRB Fort Worth and AFP4.

111.    Defendant Carrier Global does business throughout the United States, including in Texas. Carrier Global designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

112.    Defendant ChemDesign does business throughout the United States, including in Texas. ChemDesign designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

113.    Defendant Chemguard does business throughout the United States, including in Texas. It designed, manufactured, marketed, and sold PFAS-containing AFFF to military bases and other entities throughout the country, including NAS JRB Fort Worth and the operators of AFP4, from approximately 1997 to the present.

114.    Defendant Chemours does business throughout the United States, including in Texas. It designed, manufactured, marketed, sold, and distributed AFFF to military bases and other entities throughout the country, including NAS JRB Fort Worth and the operators of AFP4, for decades.

115.    Defendant Chemours FC does business throughout the United States, including in Texas. Chemours FC designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

116.    Defendant Chem Inc. does business throughout the United States, including in

- 18 -

Texas. Chem Inc. designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

117.    Defendant Clariant does business throughout the United States, including in Texas. Clariant designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

118.    Defendant Corteva does business throughout the United States, including in Texas. Corteva designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

119.    Defendant Daikin does business throughout the United States, including in Texas. Daikin designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

120.    Defendant Deepwater does business throughout the United States, including in Texas. Deepwater designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

121.    Defendant DuPont does business throughout the United States, including in Texas. DuPont designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

122.    Defendant New DuPont does business throughout the United States, including in Texas. New DuPont designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

123.    Defendant Dynax does business throughout the United States, including in Texas. Dynax designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

- 19 -

124.    Defendant Fire Service Plus does business throughout the United States, including in Texas. Fire Service Plus designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

125.    Defendant Kidde PLC, Inc. does business throughout the United States, including in Texas. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and other entities throughout the United States, including NAS JRB Fort Worth and AFP4, from approximately 2000 through 2013.

126.    Defendant Nation Ford does business throughout the United States, including in Texas. Nation Ford designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

127.    Defendant National Foam does business throughout the United States, including in Texas. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military bases and other entities throughout the country, including NAS JRB Fort Worth and the operators of AFP4, from approximately 1973 through the present.

128.    Defendant Perimeter Solutions LP does business throughout the United States, including in Texas. Perimeter Solutions LP, itself or through its predecessors in interest, designed, manufactured, marketed, and sold AFFF that was used at military bases and other locations throughout the country, including NAS JRB Fort Worth and AFP4.

129.    Defendant RTX Corporation does business throughout the United States, including in Texas. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military bases and other locations throughout the United States, including NAS JRB Fort Worth and AFP4, from approximately 2003 to 2013.

130.     Defendant Tyco (successor in interest to Ansul) does business throughout the United States, including in Texas. Tyco, Ansul, and National Foam developed, designed, manufactured, marketed, sold, and distributed AFFF to military bases and other locations throughout the United States, including NAS JRB Fort Worth and AFP4, from approximately 1974 through the present.

131.     Manufacturer Defendants developed, manufactured, marketed, distributed, and/or sold AFFF to the Air Force and the Navy at various times throughout the relevant operative period (e.g., approximately 1960 through 2016). During this period, the Air Force and the Navy distributed AFFF to military bases and other entities across the country, including NAS JRB Fort Worth and the operators of AFP4.

132.     Manufacturer Defendants continue to develop, design, manufacture, market, sell, and distribute AFFF.

### E.   Defendants knew and failed to provide notice that PFAS and PFAS-containing products are toxic.

133.     On information and belief, by at least the 1970s, Defendants knew of the risks of PFAS, including AFFF, to the environment and human health.

134.     As documented by a research arm of the U.S. Navy in a Naval Ocean Systems Center ("NOSC") study, the military was aware of toxicity studies showing harmful PFAS effects to a variety of organisms dating back to at least 1973.

135.     In addition to reviewing nonmilitary studies, U.S. military investigators conducted their own studies. For instance, in 1973, the Air Force conducted a study to assess AFFF's toxicity effects on fish in controlled laboratory experiments. One AFFF formulation tested, FC-200 Light Water, was manufactured by 3M and was on the Qualified Products List for AFFF meeting military specification MIL-F-24385.

- 21 -

136.    A 1985 literature survey by NOSC concluded that "usage of AFFF and the disposal of AFFF-laden wastewater have the potential for an adverse impact on the environment -- these foams are potentially toxic due to the fluorocarbons and surfactants." NOSC references toxicity studies showing impacts on a variety of organisms in the 1970s and 1980s. It also analyzes several studies conducted by 3M in 1980 showing AFFF's lethality at various concentrations across a 96-hour timeframe. NOSC concludes these "earlier studies demonstrated that a wide range of toxic concentrations exist for a variety of organisms."

137.    3M knew as early as the 1950s that PFAS bioaccumulates in humans and animals.

138.    A 1956 study at Stanford University concluded that the PFAS manufactured by 3M binds to proteins in blood.

139.    On information and belief, by the early 1960s, 3M also understood that PFAS are stable, persist in the environment, and do not degrade.

140.    In 1975, independent toxicologists Drs. Warren Guy and Donald Taves reported that a then-unknown organic fluorine compound had been found widely in human blood samples from different blood banks. The toxicologists contacted 3M about "potential sources" for the chemical, but 3M "pleaded ignorance" and claimed to adopt a position of "scientific curiosity and desire to assist in any way." Dkt. 2601 at 15. The toxicologists ultimately published their research in *Science*, identifying the organic fluorocompounds as "derived from commercial products." *Id.*

141.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

142.    In 1975, 3M scientist Richard Newmark authored an internal company report stating that the fluorine compound found in blood bank samplings "resembled most closely" PFOS, a chemical manufactured by 3M and used in 3M's AFFF product. *Id.*

- 22 -

143.    In 1976, a team headed by 3M scientists Don Hagan and Jon Belisle confirmed that "Guy and Taves' spectra reflects the presence of PFOS." *Id.* at 16. But in 1981, Jon Belisle published an article in *Science* stating that the compound that was the subject of the Guy and Taves article was not man-made, but rather a naturally occurring substance. *Id.*

144.    A 1978 study by 3M on PFOA and PFOS specifically confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

145.    In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

146.    In 1979, an internal company document showed PFOS were "water soluble," "resistant to microbial degradation," "highly mobile" in soil, and likely to end up in "waterways" as an "environmental sink for the product." *Id.* at 19.

147.    In 1988, a 3M environmental specialist wrote in an internal memo, "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable. It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market." *Id.*

148.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals, which confirmed 3M's understanding that fluorochemicals bioaccumulate.

149.    The potential loss of profits drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "defensive barriers to litigation."

150.    Despite 3M's research in the 1970s through the 1990s, 3M did not disclose any

information on the health or environmental effects of PFOS outside the company. Instead, an internal document stated, "3M lawyers urge [Central Analytical Laboratory] not to release the true identity (PFOS) of the compound." *Id.* at 16.

151.    A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

152.    In exchange for providing grant money to researchers, 3M obtained the right to review and edit drafts of papers on PFAS and sought control over when and whether these papers were published at all.

153.    From the 1970s onward, 3M conducted over a thousand studies on the properties of PFOS but never disclosed those studies to EPA or outside the company. Before 1998, 3M had released only 84 such studies. After 1998, 3M made long overdue disclosures of over 1,200 additional studies, leading EPA to fine 3M $1.5 million for withholding reports that "produced valuable, previously unreported information that will help the scientific community to better understand the presence of toxic substances in the environment." *Id.* at 17.

154.    In 1998, 3M revealed PFOS was in the blood of the general population, but it assured the public PFOS was safe. Internally, however, 3M's Manager of Corporate Toxicologist, Dr. John Butenhoff, wrote about the need to "replace PFOS-based chemistry as these compounds [are] VERY persistent and thus insidiously toxic." *Id.* Dr. Butenhoff considered a safe level of PFOS in blood to be 1.05 ppb. *Id.*

155.    Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, which it had developed more than 50 years earlier. 3M ceased production of PFOS-based AFFF by 2002.

156.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."

157.    In contrast, 3M stated in its news release on the same event that "our products are safe," while extolling their "principles of responsible environmental management" as driving the decision to cease their production.

158.    As part of the multi-year phase-out, 3M engaged in a damage-control campaign to influence its customers' reactions to the phase-out and encourage them to continue buying its toxic PFOS- and PFOA-based products during the phase-out period and, on information and belief, possibly longer.

159.    Defendants had a duty, which they breached, to notify EPA when they had reason to believe that a substance or mixture—such as PFAS—presented a substantial risk of injury to health or the environment.

160.    Prior to about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF.

161.    By about 1983, MSDSs for certain AFFF products directed users to collect AFFF before discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

162.    By 2010, SDSs for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and

preventing entry into waterways, sewers, basements, or confined spaces. For large spill releases, SDS procedures required diking the spill for later disposal; use of noncombustible materials such as vermiculite, sand, or earth to soak up the product; and containerizing the product for later disposal.

163.    By 2010, following product recovery, SDS procedures for certain AFFF products required flushing the area with water and cleaning the surface thoroughly to remove residual contamination. MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plant without permission.

164.    Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of AFFF health and environmental risks, or of all precautions they should take—risks and precautions that Defendants knew or should have known existed or were necessary.

165.    When 3M stopped manufacturing AFFF in approximately 2000, several manufacturers that used a fluorotelomerization process to produce their AFFFs sought to exploit the new business opportunity, but they recognized there was doubt about the safety of their telomer-based AFFFs.

166.    These telomer-based AFFF manufacturers, fluorosurfactant manufacturers, and distributors, including Kidde, National Foam, Dynax, DuPont, and Buckeye, established a lobbying group called the Fire Fighting Foam Coalition ("FFFC") in 2001. *Id.* at 25.

167.    FFFC represented that its foams did not contain PFOS or PFOA, but it omitted crucial information on the risk that the telomer-based AFFFs would degrade into PFOA in the environment. *Id*. When EPA raised concerns about the telomer-based AFFFs being connected to PFOA, FFFC persuaded EPA that these concerns were unfounded. *Id.* at 27.

168.    Internally, the telomer-based AFFF manufacturers knew their AFFFs would likely

degrade into PFOA in the environment.

169.    In 2006, EPA initiated a "PFOA Stewardship Program" with an ultimate goal of phasing out the use of AFFF Products containing PFOA by 2015. EPA asked "the eight major companies in the PFASs industry" to commit to eliminate PFOA from their products by 2015. These companies were Arkema, Asahi Glass Co. (predecessor to AGC, Inc.), BASF, Clariant, Daikin, 3M, Old DuPont, and Solvay Solexis. The PFOA Stewardship Program was widely publicized, and all eight companies made public promises to phase out their use of PFOA by 2015.

170.    In 2009, EPA announced a Long-Chain Perfluorinated Chemicals Action Plan that discussed the agency's intent to go beyond the PFOA Stewardship Program and pursue the elimination of "long-chain PFCs" (which include PFOA and other PFAS chemicals) from all manufacturers' products, as well as other goals related to eliminating many other types of PFAS.

171.    AFFF Manufacturer Defendants were aware of EPA's PFOA phase-out program and took steps during the phase-out period to replace their existing foam products, which used PFAS with eight or more carbon atoms, such as PFOA ("Long Chain PFAS"), with products that used fewer than eight carbon atoms ("Short Chain PFAS").

172.    Although FFFC represented that only Short Chain PFAS surfactants were used to manufacture telomer-based AFFFs, this was untrue because PFOA continued to be used in manufacturing. FFFC's representations on this point were intended to distinguish telomer-based AFFFs from 3M's discontinued AFFF. *Id.* at 27–28. These representations were also deceptive due to the toxic nature of even Short Chain PFAS.

173.    AFFF Manufacturer Defendants had reason to believe their Long Chain PFAS-containing foam products would be unmarketable or unsaleable after the 2015 phase-out deadline, yet continued to market, sell, and provide instructions for the use of Long Chain AFFF Products

throughout the PFOA Stewardship Program and other EPA actions aimed at eliminating PFAS use, in order to dispose of inventory that was or would soon be rendered valueless by regulatory pressure and environmental and health concerns.

174.    Existing stocks of fluorinated AFFF may still be used at NAS JRB Fort Worth, at least for emergency and testing purposes.

175.    In the 1970s, AFFF Manufacturer Defendants began making AFFF that included shorter carbon chain PFAS. Those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.

176.    Some or all of the AFFF Manufacturer Defendants continue to develop, manufacture, and/or sell AFFF containing Short Chain PFAS.

177.    Short Chain PFAS also accumulate in blood and other tissues and will persist indefinitely in the environment, posing threats to the environment and health.

178.    Short Chain PFAS are also difficult to remove from the environment and can break through carbon filtration systems, possibly more easily than Long Chain PFAS.

179.    There are at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire Ltd., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which are economically and technologically feasible.

180.    On information and belief, AFFF Manufacturer Defendants knew Short Chain PFAS-containing AFFF products were still harmful and viewed such products as a stopgap measure to enable continued sales even as they understood the industry was moving toward PFAS-free foams.

**F.  DOD used and released AFFF at Carswell Air Force Base and NAS JRB Fort Worth.**

181.    In 1970, DOD began using AFFF at military installations, including Carswell Air

Force Base, located at what became NAS JRB Fort Worth in 1994, during firefighting training activities and to extinguish fuel-based fires. Any references to NAS JRB Fort Worth hereafter should be understood to also refer to the former Carswell Air Force Base.

182.    From the early 1970s to 2023, the military used exclusively fluorinated AFFF for firefighting and training, and, on information and belief, a significant portion of the military's AFFF inventory is still composed of fluorinated AFFF.

183.    For decades, 3M was the primary supplier of AFFF to the DOD stock system that supplied military bases, including NAS JRB Fort Worth.

184.    The military's Qualified Products Database listed 3M AFFF products as early as 1970, and Tyco products as early as 1976. The other Manufacturer Defendants provided AFFF to the DOD at various times from about 1973 to the present.

185.    According to a 2011 DOD risk alert document, "through 2001, the DOD purchased AFFF from 3M and/or Ansul, Inc. 3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF."

186.    NAS JRB Fort Worth spans over 2,484 acres. Thousands of gallons of AFFF manufactured by Manufacturer Defendants were used and/or stored by the United States at NAS JRB Fort Worth from approximately 1970 through at least 2018.

187.    The AFFF manufactured by Manufacturer Defendants was expected to reach NAS JRB Fort Worth without substantial change in the condition in which it was distributed and sold to the Air Force and the Navy, and it did.

188.    Air Force and Navy personnel used AFFF in training exercises and other activities at NAS JRB Fort Worth, including firefighting and explosion training.

189.    The Air Force and Navy discharged and disposed spent AFFF to the environment at

- 29 -

NAS JRB Fort Worth. Such discharge and disposal of spent AFFF, including its PFAS components, includes, but is not limited to, releases and discharges into soil and water pathways that connect NAS JRB Fort Worth to the City's Property.

190.    DOD disposed AFFF at NAS JRB Fort Worth by, for example, washing it into its stormwater system, which ultimately discharges in significant part to Lake Worth.

191.    For instance, training, exercises, and fire response activities occurred on open ground at NAS JRB Fort Worth, causing PFAS waste to drain into soil, groundwater, surface waters, wetlands, ponds, and ditches.

192.    Specifically, stormwater from the north end of the base drains directly into Lake Worth.

193.    The base slopes downward from the southwest corner toward the northeast border formed by Lake Worth and the West Fork of the Trinity River. The elevation at the southwest corner is approximately 690 feet above mean sea level. At the eastern border, elevation is approximately 550 feet above mean sea level. The elevation of Lake Worth is approximately 594 feet above mean sea level.

194.    The "Final Sampling and Analysis Plan (Field Sampling Plan and Quality Assurance Project Plan) for Off-Property Drinking Water Per- and Polyfluoroalkyl Substances Sampling, Naval Air Station Fort Worth Joint Reserve Base Fort Worth, Texas," prepared in August 2019 by Tetra Tech, Inc., states, "Based on the data available to date, multiple PFAS sources and releases are attributed to aircraft incidents involving use of firefighting foam on and around the airfield; fire-fighting training areas adjacent to the runways; and multiple releases from aircraft hangar fire-fighting foam systems, with the runoff from the releases flowing into stormwater ditches and eventually reaching the West Fork Trinity River or Lake Worth."

195.    The "Per- and Polyfluoroalkyl Substances Site Inspection Report for Multiple Sites, Rev. 1, Naval Air Station Joint Reserve Base Fort Worth Fort Worth, Texas" ("2023 PFAS Site Inspection Report"), prepared in November 2023 by Tetra Tech, Inc., states, "Because PFOA, PFOS, PFBS, PFNA, and PFHxS groundwater concentrations at NAS JRB Fort Worth exceed the risk-based screening levels, it is possible that groundwater impacted by PFAS may have discharged into surface water." On information and belief, the United States' discharges of PFAS to groundwater have contaminated Lake Worth.

196.    In the 2023 PFAS Site Inspection Report, the United States identified the following areas of NAS JRB Fort Worth as potential sources of PFAS contamination via fire training activities:

- Fire Training Building/Building 1014 – constructed in 2002. AFFF was historically used in fire training activities and discharged at this site.

- Fireman Training Facility/Former Building 4126 – constructed in 1971 and used for fire training activities until removal in mid-1990s.

- Fire Department Training Area No. 2 – site for fire training exercises between 1963 and 1989. AFFF was historically used in fire training activities and discharged at this site.

197.    The same report details many documented areas across the base from which AFFF was released into the environment:

- Hangar/Building 1027 – used for aircraft maintenance and repair. On December 5, 2019, approximately 2,750 gallons of water, which included 82.5 gallons of AFFF concentrate, was accidently released. Approximately 2,350 gallons of the AFFF/water mixture entered the storm sewer drainage system and approximately 400 gallons entered the sanitary sewer system.

- Hangar/Building 1049 – used for aircraft maintenance and repair, with one AFFF release

reported around 2010. The water and AFFF flowed out the hangar and into the floor drains and storm sewer system, which discharge off site to the West Fork Trinity River.

- Hangar/Building 1050 – used for aircraft maintenance and repair, with at least two or three AFFF discharges occurring in the 1990s. The water and AFFF flowed out the hangar and into the floor drains and storm sewer system, which discharge off site to the West Fork Trinity River.

- Building 1191/Vehicle Maintenance Shop – used for vehicle maintenance, and most of the water and foam from the testing, cleaning, and maintenance was allowed to run off into the grass and to storm drains or to evaporate from the concrete. The fire training distance and dispersion testing of the fire suppression systems on the trucks was also formerly performed adjacent to Building 1191.

- Building 1402/Air Logistics Training Center Schoolhouse – A release of approximately 200 gallons of AFFF occurred a few years ago here (exact date not available). Some portion of the water and AFFF concentrate flowed out the hangar and entered the storm sewer system.

- Fire and Rescue Station/Building 1425 – includes eight bays for staging emergency vehicles plus a drive-through bay. When necessary, concentrate is manually refilled on the crash rescue trucks at the fire station from 5-gallon buckets. There is no overfill/spill containment for this activity. Empty AFFF concentrate containers are disposed of along with other municipal waste from the installation. Prior to disposal, the empty containers are sometimes rinsed onto the ground or in the stormwater drainage system. The crash rescue trucks were formerly washed and maintained at the fire station. The wash water drains to the unpaved areas east of Building 1425 or to the stormwater drainage system via the drain system located along the aprons.

- Building 1643/Aircraft Maintenance Dock – used for aircraft maintenance and repair. It is

- 32 -

currently operated by the Air Force. The floor drains within Building 1643 are tied into the OWS system (SWMU 40), which discharges to the storm sewer system. AFFF was historically used in this building, and February 2022 sampling confirmed the presence of PFAS.

- Building 1644/ Fire Protection Pump – currently operated by the Air Force. There was a release within the hangar in 2013 or 2014, although the exact date and volume of the release are not available. The water/AFFF mixture flowed into the floor drains.

- Building 1674/Maintenance Dock – currently operated by the Texas Air National Guard. In 2003, a contractor working on the fire suppression system triggered a release of AFFF within the hangar. The AFFF/water mixture was drained through the stormwater system to outside the building. A second release occurred in 2008 when a lightning strike caused the fire suppression system to activate, including the release of AFFF/water mixture within the building.

- Building 1675/Aircraft Shops – currently operated by the Texas Air National Guard. A release was identified in 2011 caused by a drain plug failure resulting in approximately 5 gallons of AFFF concentrate spilled on the "foam room" floor. The AFFF concentrate was cleaned from the foam room and did not enter the sewer system or exit the building.

- Building 1676/Maintenance Hangar – currently operated by the Texas Air National Guard. Approximately 20 years ago (circa 1998-1999), the AFFF skid leaked an estimated 750 gallons of AFFF to the hangar floor and drain system. The resulting foam exited the hangar, filled the storm drains, and was discharged to Lake Worth.

- Runway – During the course of flight activity and training at similar bases, when a flight crew realizes that an apparent or actual failure of landing or other critical systems has occurred during the flight, the protocol may include a practice of "foaming the runway" during which a layer of AFFF is sprayed across the end of the runway to minimize the chances for an extensive

fuel-related fire during an uncontrolled landing.

- Southern Plane Crash Area (Boeing KC-135A) – AFFF was likely used at this crash location during fire and rescue efforts. In March 1972, a Boeing KC-135A Stratotanker crashed during landing maneuvers at NAS JRB Fort Worth when the right wingtip struck the ground. The plane veered to the right, cartwheeled when the wing struck the grass, and caught fire. The topographic drainage around the runway is through surface drainage which generally discharges through surface runoff and storm drains on the south half of the runway to the southeast and east to Farmers Branch or Kings Branch and eventually West Fork Trinity River.

- Northern Plane Crash Area (F-16D) – AFFF was likely used at the crash location during fire and rescue efforts. In October 1989, an F-16D jet on a training mission from nearby NAS Dallas exploded in flight and crashed at the base. Topographic drainage around the runway is through surface drainage, which generally discharges to Lake Worth from the north half of the runway.

198.    The 2023 PFAS Site Inspection Report and "Draft Final Preliminary Assessment of Potential Sources of Per- and Polyfluoroalkyl Substances (PFAS), Naval Air Station (NAS) Joint Reserve Base (JRB) Fort Worth, Texas," prepared in February 2020 by Tetra Tech, Inc., further detail potential other source areas. On information and belief, AFFF was also released into the environment from the following sites addressed in the report:

- Hanger/Building 1048 – used for aircraft maintenance and repair. The fire suppression system includes eight cannons located around the hangar with adjoining tanks containing AFFF. The floor drains eventually discharge to the storm sewer system.

- Building 1161/Shelter for Petroleum Oil and Lubricants – houses the fuel farm fire suppression system, including two 2,000-gallon tanks containing AFFF.

- Former Building 1190/Central Waste Holding Area – The building and adjacent area were used as a central waste holding facility, including areas for temporary drum storage, an OWS (SWMU 52), and a waste oil tank.

- Hangar/Building 1403 – The fire suppression system here includes four cannons within the hangar connected to a pump house (Building 1412) to supply fire water and AFFF.

- Hangar/Building 1404 – The fire suppression system here includes two cannons within the hangar connected to one bladder tank containing AFFF.

- Hangar/Building 1405 – The fire suppression system at Building 1405 – OPS Hangar and Transient Line includes a deluge system with pre-activation risers within the hangar connected to a pump house (Building 1412) to supply fire water and AFFF.

- Fire Pump House/Building 1412 – houses the fire suppression system to Building 1403 – Hangar and Building 1405 – OPS Hangar and Transient Line, including water pumps and one poly-tank containing AFFF concentrate.

- Building 4205/RATCF/Storage Building – approximately 2,000 to 3,000 gallons of AFFF concentrate are stored on pallets within Building 4205. This AFFF concentrate is all new C6 military specification, and there are no floor drains or secondary containment within the storage building.

- Building 4210/14th Marine Regiment Headquarters and Training Building. The fire suppression system here includes two bladder tanks containing AFFF tied to a deluge fire suppression system. The floor drains are tied into the OWS system (AOC 12), which discharge to the storm sewer system.

- Building 4260/Aircraft Acoustical Enclosure – houses the aircraft engine test cell. The fire suppression system here includes two bladder tanks containing AFFF tied to a deluge fire

suppression system.

- Landfill No. 1 – Located in the southeastern portion of the base adjacent to the Trinity River, Landfill No. 1 was used as the main base landfill during the 1940s and operated between 1942 and 1989. PFAS-containing materials were likely disposed of in this landfill based on similar operations at other military installations.

- Landfill No. 5 – approximately 3.1 acres in size, served as an active base landfill from 1963 through 1975. Reportedly received wastes from the flightline area, which were regularly burned prior to covering. PFAS were likely disposed of in this landfill or that AFFF was used to extinguish the burning refuse within the landfill.

- Waste Burial Area – active in the 1960s and located south of Landfill No. 5. Waste materials disposed of at this landfill included drums of cleaning solvents, tetraethyl lead sludge, and small quantities of undetermined waste. PFAS-containing materials were likely disposed of in the Waste Burial Area (SWMU 24).

- Entomology Dry Well (Site 15, SWMU 63) – A dry well at this site was used for disposal of pesticide and herbicide-contaminated rinse water between 1965 and 1981. PFAS was and remains a component of some pesticides and herbicides and PFAS were likely disposed of in this area.

199. Between January and March 2022, NAS JRB Fort Worth collected and tested 30 soil samples and 39 groundwater samples at the potential PFAS source areas. The maximum detected concentrations of PFAS in groundwater were as follows:

| PFOS (ppt) | PFOA (ppt) | PFBS (ppt) | PFNA (ppt) | PFHxS (ppt) |
|---|---|---|---|---|
| 29,800 | 10,900 | 2,510 | 340 | 22,400 |

The maximum detected concentrations of PFAS in soil were as follows:

- 36 -

| PFOS (ppb) | PFOA (ppb) | PFNA (ppb) | PFHxS (ppb) |
|:---:|:---:|:---:|:---:|
| 5,470 | 97 | 27 | 223 |

200.    On December 5, 2019, NAS JRB Fort Worth inadvertently released 3,000 gallons of an AFFF mixture that escaped past booms and entered surface waters surrounding the base.

201.    In the National Defense Authorization Act of 2020, Congress mandated the phaseout of almost all fluorinated AFFF at all military sites no later than October 1, 2024, banned uncontrolled releases of fluorinated AFFF at military installations except in emergencies, and banned the use of fluorinated AFFF in training exercises. DOD, however, exercised a one-year waiver to extend the deadline to October 1, 2025.

202.    On January 6, 2023, DOD issued MIL-PRF-32725, a performance specification for fluorine-free foam setting a maximum of 1 part per billion of PFAS in the foam concentrate.

**G. Air Force Plant 4 is an additional source of PFAS released into the City's Property.**

203.    Air Force Plant 4 ("AFP4") is a Government-Owned Contractor-Operated ("GOCO") aircraft manufacturing facility located directly west of NAS JRB Fort Worth and abutting Lake Worth to the north.

204.    Military aircraft began being manufactured at AFP4 in 1942.

205.    From 1942 to 1953, Consolidated Aircraft Company, known as Convair after 1943, leased AFP4 from the United States and operated the facility.

206.    In 1953, General Dynamics acquired Convair. From 1953 to 1993, General Dynamics leased AFP4 from the United States and operated the facility.

207.    In 1993, Lockheed Martin acquired General Dynamics. From 1993 to present, Lockheed Martin has leased AFP4 from the United States and operated the facility.

208.    Over several decades, owners and/or lessees of AFP4 have released AFFF into the soil, groundwater, and surface water at and adjacent to AFP4, contaminating the same with PFAS including but not limited to PFOS and PFOA.

209.    Groundwater under AFP4 seeps to Meandering Road Creek, which discharges to Lake Worth. On information and belief, groundwater contaminated with PFAS entered Lake Worth by this pathway.

210.    The storm sewer of AFP4 drains to numerous outfalls east of Meandering Road Creek. Meandering Road Creek receives runoff from the outfalls, and the runoff ultimately reaches Lake Worth. On information and belief, the runoff contains PFAS originating from AFP4.

211.    The "Final Site Inspection Report, Site Inspection of . . . AFFF Release Areas Environmental Programs Worldwide, [AFP4], Fort Worth, Texas," prepared in March 2019 by Amec Foster Wheel Programs, Inc. and Oneida Total Integrated Enterprises, notes six potential sources of PFAS contamination at AFP4:

- Fire Department Training Area (FDTA) No. 6 (IRP Site ID FT009) – Fire training activities took place every three months for three shifts from approximately the late 1960s to 1982. An unknown amount of AFFF was released at FDTA No. 6.

- Buildings 162-168 (run stations 1-16) – each have AFFF fire suppression systems. Five documented releases of AFFF from the systems occurred from July 1998 to December 1999. Eight AFFF pipe leaks were also identified in the area. In 2000, the piping was replaced due to leaks and failures associated with the system. Approximately 50,000 gallons of AFFF have been released since the system was installed in 1980. Releases associated with the leaks were of AFFF concentrate released directly to the ground surface. Reportedly, released AFFF seeped through concrete expansion joints. Approximately 2,000 gallons of AFFF released from

- 38 -

accidental fire suppression system activations within the buildings were reportedly contained in trench drains and not released to the environment. The trench drains route discharges to Outfall 10, a storm drain outfall located southeast of the buildings. Outfall 10 is a concrete-lined containment pond area. Drainage is contained in the unit at Outfall 10 and is collected and transferred to the wastewater treatment plant. Additionally, AFFF releases have occurred from fire suppression system testing activities conducted in the grassy area to the east of the buildings. The testing occurred every five years since 1980, with approximately 5,000 gallons of AFFF released during each test. The AFFF was released directly to the ground surface.

- Buildings 210-212 – Historically, AFFF fire suppression system testing included extending hoses from Building 212 and spraying AFFF onto a grassy area next to and west of Building 144, and north of Buildings 210-212. According to the preliminary assessment, the exact amount of AFFF released during testing is unknown but reported to be less than 100 gallons.

- Time and Distance Testing Area near Building 217 – The fire department performs testing of the AFFF systems on fire fighting vehicles at two locations to the east and south of Building 217. These locations include the grassy area east of Building 217 and north of Building 614, and the grassy area south of Building 217 and beyond the driveway south of the building. According to AFP4's Fire Protection Engineer, each annual test since 2002 released approximately 100 gallons of liquid containing AFFF directly to the ground surface. It is unknown which area is used each time testing is performed, so there is potential for AFFF contamination at both grassy areas.

- Wastewater Treatment Plant Effluent – Approximately 2,000 gallons of AFFF have been released at Buildings 210, 211/212, and 217 since 1998. The AFFF waste flowed to subgrade and aboveground containment pits. In addition, the preliminary assessment indicated that

approximately 2,150 gallons of AFFF were released at the Fuel Test Area pad, and the wastes would have collected in the secondary containment for this area. These wastes were collected from the containment pits and containment structures and taken to the wastewater treatment plant. Effluent from the same routes to the City of Fort Worth sanitary sewer.

- Outfall 3 – Lockheed Martin Environment Safety and Health representatives stated that Building 230 houses an AFFF fire suppression system. The AFFF tank and piping is situated within a concrete-bermed secondary containment pit. Spills and leaks would collect in this secondary containment pit. Lockheed Martin stated that waste from this area is periodically collected by vacuum truck and taken to Outfall 3 where it is pumped into an oil/water separator that discharges to Lake Worth. According to the representative, AFFF is not known to have been "deliberately" released to Outfall 3.

212.    The use and uncontrolled disposal of AFFF at AFP4 has contaminated the City's Property.

**H. The discretionary-function exception does not apply to the City's FTCA claims.**

213.    The discretionary-function exception to the FTCA, 28 U.S.C. § 2680(a)—which provides that the government is not liable for acts that involve "an element of judgment or choice" and were "based on considerations of public policy" (Dkt. 6728 at 15)—does not bar the City's FTCA claims.

214.    The United States' PFAS discharges violated mandatory laws, regulations, policies, directives, orders, and instructions, including, but not limited to: Air Force Regulations ("AFRs"); Air Force Instructions ("AFIs"); Office of the Chief of Naval Operations Instructions ("OPNAVINST"); Engineering Technical Letters ("ETLs"); Unified Facilities Criteria ("UFC"); the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.*; CERCLA, 42 U.S.C. §§ 9601, *et seq.*; RCRA, 42

- 40 -

U.S.C. §§ 6901, *et seq.*; Texas' Solid Waste Disposal Act, Tex. Health & Safety Code § 361.001, *et seq.*; and Executive Orders.

215.    The United States violated AFR 92-1 (1974) at 4-10 (superseded by AFI 32-2001 (1994)), which provides: "Use only protein foam for this purpose [runway foaming]."

216.    The United States violated AFR 19-1 (1974) at (2)(b)(4), which provides: "Make all practical efforts to . . . [d]ispose of or discharge pollutants in a manner that will not: (a) expose people to concentrations of any agent (chemical, physical, or biological) hazardous to health. (b) alter the natural environment so that an adverse effect is created with respect to human health or the quality of life. (c) result in substantial harm to domestic animals, fish, shellfish, or wildlife. (d) cause economic loss through damage to plants or crops. (e) impair recreational opportunity and natural beauty or cause groundwater contamination."

217.    The Assistant Secretary of the United State Air Force for Installations, Environment, and Energy issued a mandatory "Policy on Perfluorinated Compounds (PFCs) of Concern" on August 11, 2016. The Air Force was directed to take specific steps to respond to PFOA/PFOS releases, including releases that pose an unacceptable risk in accordance with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"). The policy requires ultimate elimination of PFOS/C8-based and other PFOA-containing AFFF. It requires the Air Force to initiate new and improved firefighting and facility-related training, tactics, techniques, technology, and procedures to mitigate or eliminate the release of AFFF to the environment.

218.    The Deputy Assistant Secretary of the Navy for the Environment issued a mandatory memorandum on "AFFF . . . Control, Removal, and Disposal" on June 17, 2016, requiring all installations to "[i]mmediately cease the uncontrolled release of AFFF for shoreside installations, with the exception of emergency responses," "verify and ensure . . . appropriate controls in place to

prevent an environmental release," and "remove and dispose of uninstalled PFOS-containing AFFF" by the end of 2017 "to prevent future environmental releases." AFFF spills from NAS JRB Fort Worth on May 17, 2017, October 2, 2018, December 5, 2019, and April 14, 2020, and, on information and belief, other dates after June 17, 2016, violated this policy.

219.    On information and belief, the United States violated NPDES permits issued to NAS JRB Fort Worth, including but not limited to provisions controlling visible foaming in discharges.

220.    On information and belief, the United States violated installation-specific policies at NAS JRB Fort Worth limiting the use, discharge, management, and disposal of AFFF.

221.    On information and belief, the United States also violated the following mandatory regulations, instructions, and policies:

(a) Policies governing the construction of environmentally acceptable facilities, protection of human health and the environment, environmental standards and regulations, and environmentally sensitive areas. *See* AFI 32-2001 (May 16, 1994); AFI 32-7042 (November 7, 2014); AFI 32-7042 (April 15, 2009); AFI 32-1023 (April 21, 2010); AFI 32-1023 (November 19, 2015).

(b) Policies controlling the discharge, collection, and management of solid and hazardous waste. *See* AFI 32-7042 (November 7, 2014); AFI 32-7042 (April 15, 2009); AFI 32-1067 (March 25, 1994); AFI 32-1067 (April 3, 2013); AFI 32-1067 (February 4, 2015); AFI 32-7041 (May 13, 1994); AFI 32-7041 (December 10, 2003); OPNAVINST 5100.28 (January 21, 2005).

(c) Policies controlling discharges to surface water, including policies requiring compliance with NPDES permits. *See* AFR 91-9 (December 1, 1989); AFI 32-1067 (March 25, 1994); AFI 32-1067 (April 3, 2013); AFI 32-1067 (February 4, 2015); AFI 32-7041 (May 13, 1994); AFI 32-7041 (December 10, 2003); OPNAVINST 5090.1B (November 1, 1994); OPNAVINST 5090.1B CH-1 (February 2, 1998); OPNAVINST 5090.1B CH-2 (September 9, 1999); OPNAVINST 5090.1B CH-3 (October 17, 2002); OPNAVINST 5090.1B CH-4 (June 4, 2003); OPNAVINST 5090.1C (October 30, 2007); ETL 91-4 (June 14, 1991); ETL 98-7 (April 29, 1998); ETL 86-6 (June 4, 1986); ETL 01-4 (December 31, 2001); ETL 01-2 (April 1, 2001); ETL 02-15 (December 3, 2002); UFC 3-600-01 (September 26, 2006); UFC 3-600-01 (August 8, 2016).

(d) Policies safeguarding against contaminating surface and groundwater. *See* AFR 91-10 (January 2, 1990).

222.    The United States' conduct was not grounded in policy considerations.

223.    The United States' discharge of PFAS was a matter of scientific, technical, or professional judgment concerning safety. Routinely discharging PFAS in a wholly uncontrolled manner is not susceptible to social, economic, or political policy analysis.

224.    The United States' discharges of PFAS, including through the accidental release of AFFF, was frequently the result of carelessness, inattention, or recklessness, not policy judgment. *See* Dkt. 6728 at 23 (holding that "instances of negligent releases suggest careless inattention and cannot be said to be based on policy considerations").

225.    There is no policy benefit to acting negligently, trespassing, and creating a public nuisance through PFAS releases to the City's Property.

226.    Properly handling, disposing of, and treating PFAS pose no threat to national security, and decisions on how to manage the use and disposal of PFAS-containing materials involve no national security judgments.

## I.    The City has been damaged by Defendants' actions, and that damage is ongoing.

227.    Due to Manufacturer Defendants' manufacture, marketing, sale, and distribution of AFFF containing PFAS, and the Federal Defendants' use and uncontrolled disposal of AFFF at NAS JRB Fort Worth and AFP4, the City has suffered injury to its property and economic injury.

228.    Such PFAS contamination has injured the City's property rights in Lake Worth and its right to draw water from its other water sources, preventing the City from fully utilizing and enjoying its property.

229.    Such PFAS contamination has caused the City financial injury.

230.    The City's costs as a water provider include, but are not limited to, those to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other

media for PFAS; respond to public inquiries and manage public relations regarding the contamination; investigate treatment options; arrange to treat water by installing, operating, and maintaining filtration systems; and increase the frequency of water quality testing and monitoring; and manage and dispose of potentially contaminated water treatment residuals and biosolids.

231.    The PFAS contamination caused by Defendants is not contained and continues to spread into the City's Property.

232.    If the City's Property is not remediated, PFAS contamination will continue to impact the City's Property far into the future due to the nature of PFAS, as described above.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF – CERCLA COST RECOVERY
### (FEDERAL DEFENDANTS AND AFFF MANUFACTURER DEFENDANTS)

233.    The City incorporates all averments in this Complaint as if restated fully herein.

234.    Federal Defendants and AFFF Manufacturer Defendants are "persons," as defined by CERCLA § 101(21), 42 U.S.C. § 9601(21).

235.    The places at which PFAS have come to be located on and in the City's Property are "facilities," as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

236.    PFOA and PFOS are "hazardous substances" under CERCLA. 42 U.S.C. § 9601(14); *see* 42 U.S.C. § 6921.

237.    Other PFAS are expected to constitute hazardous substances once designated as hazardous wastes under RCRA. 42 U.S.C. § 9601(14); 42 U.S.C. § 6921; 42 U.S.C. § 6903(5). That is, PFAS beyond just PFOA and PFOS "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been

- 44 -

"improperly treated, stored, transported, or disposed of, or otherwise managed."

238. Federal Defendants currently own and operate and at all relevant times owned and/or operated NAS JRB Fort Worth and AFP4 when PFAS were released therefrom.

239. In purposefully discharging AFFF to ground and stormwater drains for decades without taking adequate measures to contain AFFF or the PFAS therein, Federal Defendants also arrange and arranged for disposal of AFFF containing PFAS with the intent to dispose of the AFFF.

240. Federal Defendants are therefore "persons" liable under CERCLA § 107(a)(1)-(3), 42 U.S.C. § 9607(a)(1)-(3).

241. AFFF Manufacturer Defendants arrange and arranged for the disposal of PFAS from NAS JRB Fort Worth and AFP4 by designing, manufacturing, marketing, selling, and providing instructions for the use of AFFF products with the knowledge and specific intent that AFFF be released and disposed into the environment in the course of the products' typical use.

242. On information and belief, AFFF Manufacturer Defendants continued to design, manufacture, market, sell, and provide instructions for the use of AFFF products after and despite becoming aware of the nature of PFAS in AFFF as hazardous substances.

243. On information and belief, AFFF Manufacturer Defendants knew that their PFAS-containing AFFF was harmful to humans and the environment, and intentionally shielded that information from others.

244. On information and belief, AFFF Manufacturer Defendants continued selling PFAS-containing AFFF despite the environmental risks of which they were aware during phase-out periods.

245. While doing so, AFFF Manufacturer Defendants were aware that their AFFF products were likely to be globally phased out of the U.S. market under pressure from EPA, yet

continued to sell these products with the intent to dispose of them before anticipated regulatory actions would have limited or precluded such sales.

246.    3M in 2000 announced it would cease production and use of PFOS and PFOA. At this time, 3M knew or should have known that its products containing these chemicals posed serious environmental risks that, if known by the entities to whom 3M sold its products, would likely have caused some of those buyers to decline to buy 3M's products.

247.    During the period in which 3M had knowledge of the serious risks posed by its PFAS-containing AFFF, including the period following 3M's 2000 announcement of the phase-out, disposal was, on information and belief, a primary benefit to 3M in selling its AFFF products. Revenues from AFFF sales were incidental to the primary benefit of disposing of hazardous substances at no cost.

248.    On information and belief, the remaining AFFF Manufacturer Defendants also knew or should have known that their AFFF products containing PFOA (and other PFAS) posed serious environmental risks that, if fully understood by their customers, would have either precluded or at minimum reduced their sales of these products.

249.    On information and belief, before and during the EPA PFOA Stewardship Program under which PFOA manufacturing and use was phased out in the United States, AFFF Manufacturer Defendants were aware that their Long Chain PFAS-containing foams would become unmarketable and/or unsaleable after the 2015 phase-out deadline.

250.    On information and belief, given their knowledge of environmental risks posed by their products and the impending phase-out deadline for PFOA, disposal of excess inventory of unusable hazardous substances was a primary goal and benefit to AFFF Manufacturer Defendants as they continued to sell these products during this period.

251.    AFFF Manufacturer Defendants are therefore "persons" liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

252.    Federal Defendants' and AFFF Manufacturer Defendants' disposal of PFAS are "releases" within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22), and have resulted in the contamination of the City's Property.

253.    Federal Defendants and AFFF Manufacturer Defendants are responsible for PFAS releases that have caused the City to incur, and to continue to incur, "response costs" within the meaning of CERCLA §§ 101(23)–(25), 42 U.S.C. §§ 9601(23)–(25).

254.    All such costs are necessary and consistent with the National Contingency Plan. 40 CFR Pt. 300. As described elsewhere, the City's response is commensurate to the public health threat and treatment needs posed by PFAS contamination of the City's water supplies. In addition, all response costs for which the City seeks recovery were incurred through a decision-making process guided by a preliminary assessment/site inspection, field sampling plan, quality assurance project plan, and engineering evaluation/cost analysis, or the substantial equivalents thereof.

255.    The City is entitled to reimbursement from Federal Defendants and AFFF Manufacturer Defendants for all such response costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

**SECOND CLAIM FOR RELIEF – SOLID WASTE DISPOSAL ACT COST RECOVERY (FEDERAL DEFENDANTS AND AFFF MANUFACTURER DEFENDANTS)**

256.    The City incorporates all averments in this Complaint as if restated fully herein.

257.    Federal Defendants and AFFF Manufacturer Defendants are "persons," as defined by Tex. Health & Safety Code § 361.003(23), and persons "responsible for solid waste" under Tex. Health & Safety Code § 361.271(a).

258.    NAS JRB Fort Worth, AFP4, and all places at which PFAS discharged therefrom came to rest, including the City's Property, are "solid waste facilities," as defined by Tex. Health & Safety Code § 361.003(36).

259.    The PFAS contaminating the City's Property are "solid wastes" and "hazardous substances" under the Texas Solid Waste Disposal Act. *See* Tex. Health & Safety Code § 361.003(11)(A), (35).

260.    Federal Defendants currently own and/or operate and at all relevant times owned and/or operated NAS JRB Fort Worth and AFP4 when PFAS were released therefrom.

261.    In purposefully discharging AFFF to ground and stormwater drains for decades without taking adequate measures to contain AFFF or the PFAS therein, Federal Defendants also arrange and arranged for disposal of AFFF containing PFAS with the intent to dispose of the AFFF.

262.    AFFF Manufacturer Defendants arrange and arranged for the disposal of PFAS from NAS JRB Fort Worth and AFP4 by designing, manufacturing, marketing, selling, and providing instructions for the use of AFFF products with the knowledge that AFFF contained hazardous substances and the specific intent that AFFF would be disposed into the environment in the course of the products' typical use.

263.    On information and belief, AFFF Manufacturer Defendants continued to design, manufacture, market, sell, and provide instructions for the use of AFFF products after and despite becoming aware of the nature of PFAS in AFFF as hazardous substances.

264.    On information and belief, while doing so, AFFF Manufacturer Defendants were aware that their AFFF products were likely to be globally phased out of the U.S. market under pressure from EPA, yet continued to sell these products with the intent to dispose of them before anticipated regulatory actions would have precluded such sales.

265.    Federal Defendants' and AFFF Manufacturer Defendants' disposal of PFAS are "releases" within the meaning of Tex. Health & Safety Code § 361.003(28).

266.    Federal Defendants and AFFF Manufacturer Defendants are responsible for PFAS releases that have caused the City to incur, and to continue to incur, costs for removal or remedial action within the meaning of Tex. Health & Safety Code § 361.344(a).

267.    All such costs are reasonable and necessary. As described elsewhere, the City's response is commensurate to the public health threat and treatment needs posed by PFAS contamination of the City's water supplies.

268.    The City has sought and will continue to seek approval of its response actions, including the design of treatment infrastructure, from the Texas Commission on Environmental Quality.

269.    As required by Tex. Health & Safety Code § 361.344(c), the City mailed notice to Federal Defendants on July 23, 2024, and AFFF Manufacturer Defendants on August 6, 2024, of the existence of the release of PFAS and the City's intended steps to mitigate and eliminate the release of PFAS.

270.    The City is entitled to reimbursement from Federal Defendants and AFFF Manufacturer Defendants for all response costs under Tex. Health & Safety Code § 361.344.

**THIRD CLAIM FOR RELIEF – FTCA – TRESPASS (UNITED STATES)**

271.    The City incorporates all averments in this Complaint as if restated fully herein.

272.    Under the FTCA, the United States is liable in tort to the City in the same manner and to the same extent as a private individual in Texas under like circumstances. 28 U.S.C. §§ 2674, 1346(b)(1).

273.    Under Texas law, "[t]respass to real property is an unauthorized entry upon the land

of another, and may occur when one enters—or causes something to enter—another's property."
*Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011).

274.    The United States trespassed and continues to trespass on the City's Property by
contaminating such property with PFAS.

275.    Without authorization, the United States took intentional actions that caused
hazardous substances, including PFOA, PFOS, and other PFAS, to be deposited on, in, at, and
under the City's Property. Without limitation, these actions included spraying, dumping,
discharging, and disposing of PFAS-containing AFFF onto open ground, soil, and water at NAS
JRB Fort Worth during firefighting training, emergency responses, machine calibration activities.

276.    On information and belief, the United States, beyond using AFFF, also engaged in
activities involving PFAS at NAS JRB Fort Worth that resulted in PFAS escaping the base and
injuring the City's Property.

277.    PFAS attributable to the United States' activities at NAS JRB Fort Worth have
intruded on and continue to intrude on the City's exclusive possession and use of the City's
Property, causing the City harm.

**FOURTH CLAIM FOR RELIEF – FTCA – NEGLIGENCE (UNITED STATES)**

278.    The City incorporates all averments in this Complaint as if restated fully herein.

279.    Under Texas law, a "negligence claim consists of three elements: (1) a legal duty;
(2) a breach of that duty; and (3) damages proximately resulting from the breach." *City of Austin v.
Membreno Lopez ex rel. Lopez*, 632 S.W.3d 200, 210 (Tex. App.—Austin 2021, pet. denied).

280.    The United States released PFAS on, in, at, and under the City's Property through its
generation, handling, storage, and disposal of PFAS-containing AFFF at NAS JRB Fort Worth. The
United States did so without containing the discharged AFFF or taking other precautions necessary

to prevent injury to the City's Property.

281.    On information and belief, the United States also engaged in activities at NAS JRB Fort Worth involving PFAS other than using AFFF that resulted in PFAS escaping the base and injuring the City's Property.

282.    The United States had a general duty to exercise reasonable care in using PFAS-containing materials to avoid foreseeable injury to others, as well as a specific duty as a landowner to refrain from discharging substances that would foreseeably injure adjoining premises. *Amaya v. Potter*, 94 S.W.3d 856, 861 (Tex. App.—Eastland 2002, pet. denied); *Papania v. Stelly*, 939 S.W.2d 653, 655 (Tex. App.—Beaumont 1997, no writ).

283.    The United States had a duty to exercise a high degree of care owing to its handling of toxic materials.

284.    The deposit of PFAS on the City's Property has substantially and unreasonably interfered with the rights of the City and its customers to use and enjoy a safe supply of drinking water, amounting to a private nuisance negligently created by the United States.

285.    The United States' actions have breached its duty of care and caused the City harm.

**FIFTH CLAIM FOR RELIEF – FTCA – PUBLIC NUISANCE (UNITED STATES)**

286.    The City incorporates all averments in this Complaint as if restated fully herein.

287.    In Texas, a public nuisance is "a condition that amounts to an unreasonable interference with a right common to the general public." *Texas Cent. Partners, LLC v. Grimes Cnty.*, 580 S.W.3d 824, 827 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

288.    Through its uncontrolled discharges of AFFF into the environment, the United States has unreasonably interfered with the public health and inflicted a significant, pervasive, and lasting harm on the public's right to clean drinking water.

289.    The City has suffered a special injury with respect to this interference with a public right because it owns and draws drinking water from Lake Worth, and its property rights have been especially harmed by the United States.

290.    The United States' conduct amounts to a public nuisance.

**SIXTH CLAIM FOR RELIEF – NEGLIGENCE (MANUFACTURER DEFENDANTS)**

291.    The City incorporates all averments in this Complaint as if restated fully herein.

292.    Manufacturer Defendants had a duty to manufacture and/or market, distribute, and sell their AFFF and other products containing PFAS in a manner that avoided contamination of the environment, including the City's Property, and avoided harm to those who would foreseeably come into contact with its chemical components.

293.    Manufacturer Defendants knew or should have known that the manufacture of AFFF and other PFAS-containing products was hazardous to human health and the environment.

294.    Manufacturer Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF and other products using PFAS because it was highly probable that the chemicals would migrate into the environment, including the environment at military installations like NAS JRB Fort Worth and industrial sites like AFP4, and contaminate ground or surface water used as a public water supply and other locations.

295.    Knowing of the dangerous and hazardous properties of PFAS, Manufacturer Defendants had the duty to warn of the hazards of consuming water containing PFAS.

296.    The City was a foreseeable victim of the harm caused by the chemical components of Manufacturer Defendants' PFAS-containing products.

297.    Manufacturer Defendants negligently designed, engineered, developed, fabricated, and tested PFAS and PFAS-containing products, negligently manufactured, and/or distributed and

sold such products, and negligently created the associated warnings and instructions.

298.    Manufacturer Defendants thereby failed to exercise reasonable care to prevent PFAS from presenting an unreasonable risk to the health of persons who would come in contact with them. Manufacturer Defendants also failed to exercise reasonable care to prevent contamination of public water supplies, including the City's Property.

299.    Manufacturer Defendants' negligent design, engineering, development, fabrication, testing, warnings, and instructions constitute a pattern of continuous and ongoing tortious conduct.

300.    Manufacturer Defendants have engaged and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and instructions.

301.    Manufacturer Defendants have not recalled their AFFF and most of their other PFAS-containing products.

302.    Manufacturer Defendants' breaches of their legal duties have caused PFAS to contaminate the surface water used by the City for supplying drinking water.

303.    Manufacturer Defendants have caused, and will continue to cause, damage to the City's Property due to their negligent manufacture, distribution, and/or sale of AFFF and other products containing PFAS, as well as their negligent misrepresentation and failure to warn regarding the dangers of PFAS.

304.    Manufacturer Defendants' negligent, reckless and/or intentional acts and omissions alleged herein contaminated the City's water supplies with PFAS.

305.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the City.

306.    Manufacturer Defendants' conduct, and the resulting contamination of the City's Property by the chemical components of the Manufacturer Defendants' AFFF and other PFAS-

containing products, has caused, and will continue to cause, the City to incur significant costs.

307.    The City's costs include, but are not limited to, those to: assure water quality in compliance with federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; investigate treatment options; arrange to treat water by installing, operating, and maintaining filtration systems; increase the frequency of water quality testing and monitoring; and manage and dispose of potentially contaminated water treatment residuals and biosolids.

308.    The City has lost use and enjoyment of the City's Property and suffered injury.

## SEVENTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – FAILURE TO WARN (MANUFACTURER DEFENDANTS)

309.    The City incorporates all averments in this Complaint as if restated fully herein.

310.    A product is defective and a manufacturer is strictly liable if the product is "unreasonably dangerous because adequate warnings or instructions were not provided." *Emerson Elec. Co. v. Johnson*, 601 S.W.3d 813, 824 (Tex. App. 2018), *aff'd*, 627 S.W.3d 197 (Tex. 2021). To prove a product is defective in this manner, a plaintiff must show: (1) a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed; (3) the product contains a marketing defect; (4) the absence of a warning and/or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

311.    At all times relevant, Manufacturer Defendants knew or reasonably should have foreseen that inherent in the design of their AFFF and other PFAS-containing products was a

substantial risk that PFAS would be discharged into the environment.

312.    At the time of the design, manufacture and/or distribution and sale of AFFF and other PFAS-containing products, Manufacturer Defendants knew or should have known of the dangerous properties of such products.

313.    In particular, the storage, use, release, and disposal of Manufacturer Defendants' AFFF by military installations, airports, and/or other industrial users were foreseeable. Manufacturer Defendants knew or should have known that there was a high likelihood that PFAS from the AFFF would enter surface water, groundwater, and/or household water supplies, persist there indefinitely, cause risks to human health and the environment, and harm the City's Property.

314.    As manufacturers and/or sellers and distributors of a commercial product, Manufacturer Defendants had a duty to provide adequate and complete instructions and warnings about the risks of injury posed by their products.

315.    Manufacturer Defendants failed to provide sufficient instructions and warnings to the users of AFFF and other PFAS-containing products. As a result, users were unaware that use and release of Manufacturer Defendants' products to the environment would contaminate surface water and groundwater, including drinking water and agricultural water supplies, and cause risks to those exposed to the water supplies.

316.    Manufacturer Defendants failed to provide adequate instructions and warnings to users that PFAS contamination of the water and soil would pose serious dangers to human health and the environment.

317.    Manufacturer Defendants fail and failed to provide adequate instructions and warnings and have not recalled their AFFF and most of their other PFAS-containing products.

318.    Adequate instructions and warnings would have reduced or avoided the foreseeable

risks of harm posed by the use and release of PFAS.

319.    Had Manufacturer Defendants provided adequate warnings, users of AFFF and other PFAS-containing products would have taken measures to store, use, discharge, and dispose of such products in such a manner as to reduce or eliminate contamination of water and soil.

320.    Manufacturer Defendants' failure to warn against the likelihood of contamination from AFFF and other PFAS-containing products caused its chemical components, including PFAS, to contaminate the City's Property.

321.    Manufacturer Defendants' failure to warn of the environmental and health impacts caused by releasing AFFF directly and proximately caused PFAS to contaminate the City's Property, causing the City to lose the use and benefit of the City's Property and to incur costs to treat water drawn from its water sources and soil on its lands.

322.    Manufacturer Defendants' failure to provide adequate warnings or instructions renders Manufacturer Defendants' AFFF and other products containing PFAS defective products owing to, *inter alia*, marketing defects.

323.    Manufacturer Defendants' conduct caused the City to incur significant costs.

324.    The City's costs include, but are not limited to, those to: assure water quality in compliance with federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; investigate treatment options; arrange to treat water by installing, operating, and maintaining filtration systems; increase the frequency of water quality testing and monitoring; and manage and dispose of potentially contaminated water treatment residuals and biosolids.

**EIGHTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – DESIGN DEFECT
(MANUFACTURER DEFENDANTS)**

325.    The City incorporates all averments in this Complaint as if restated fully herein.

326.    "To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009); Tex. Civ. Prac. & Rem. Code § 82.005.

327.    At all times relevant, Manufacturer Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF and other products containing PFAS.

328.    It was foreseeable that toxic chemicals from such products that Manufacturer Defendants manufactured and/or sold and distributed would enter the water supplies of the City and cause damage to its property interests.

329.    Safer alternative designs and formulations of AFFF and other PFAS-containing products were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to the City.

330.    Further, design, formulation, manufacture, and/or distribution and sale of a product containing chemicals that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

331.    The PFAS-containing products manufactured and/or distributed and sold by Manufacturer Defendants were defective in design because the foreseeable risk of harm posed by the products could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

332.    Manufacturer Defendants' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Manufacturer Defendants' control.

333.    Manufacturer Defendants' sale and distribution of PFAS-containing products constitute a pattern of continuous and ongoing tortious conduct.

334.    Manufacturer Defendants have not recalled their AFFF and most of their other PFAS-containing products.

335.    Manufacturer Defendants' manufacture and/or distribution and sale of defectively designed products caused PFAS to contaminate the City's Property and damage the City.

336.    Manufacturer Defendants' design, formulation, manufacture and/or distribution and sale of defective products render Manufacturer Defendants strictly liable in damages to the City.

337.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of the City.

338.    Manufacturer Defendants' conduct, and the resulting contamination of the City's Property by the chemical components of the Manufacturer Defendants' products, caused the City to incur significant costs.

339.    The City's costs include, but are not limited, to those to: assure water quality in compliance with federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; investigate treatment options; arrange to treat water by installing, operating, and maintaining filtration systems; increase the frequency of water quality testing and monitoring; and manage and dispose of potentially contaminated water treatment residuals and biosolids.

## NINTH CLAIM FOR RELIEF – PUBLIC NUISANCE
## (MANUFACTURER DEFENDANTS)

340.    The City incorporates all averments in this Complaint as if restated fully herein.

341.    The use and enjoyment of clean water is a right common to the general public.

342.    Through their actions described above, Manufacturer Defendants' manufacture and/or sale and distribution of products containing PFAS constituted intentional, negligent, and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the general public's use and enjoyment of clean water, as well as the City's property rights.

343.    Given the characteristics of PFAS, Manufacturer Defendants knew and/or should have reasonably foreseen that the use of their PFAS-containing products as they intended would result in an invasion of the City's property interests, including obstruction of its use of water sources it owns. Such invasion of its property rights amounts to a special injury to the City.

344.    Manufacturer Defendants have created a public nuisance. This public nuisance continues to cause substantial and unreasonable interference with the City's property rights and the general public's use and enjoyment of clean water.

345.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the City.

346.    Manufacturer Defendants' conduct, and the resulting contamination of water sources by the chemical components of the Manufacturer Defendants' PFAS-containing products, has caused or will require the City to incur significant costs.

347.    The City's costs include, but are not limited to, those to: assure water quality in compliance with federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; investigate treatment

options; arrange to treat water by installing, operating, and maintaining filtration systems; increase the frequency of water quality testing and monitoring; and manage and dispose of potentially contaminated water treatment residuals, biosolids, and wastewater effluent.

## TENTH CLAIM FOR RELIEF – UNJUST ENRICHMENT
## (MANUFACTURER DEFENDANTS)

348.    The City incorporates all averments in this Complaint as if restated fully herein.

349.    Manufacturer Defendants profited from the manufacture and/or distribution and sale of PFAS-containing products, and continued to do so long after they were aware of the health and environmental risks of their products. Further, Manufacturer Defendants failed to recall all their products to prevent the further release of PFAS onto the City's Property, long after they became aware of the toxic qualities of PFAS. Instead, they continued to hold out their products as safe. Through fraudulent actions and inactions, Manufacturer Defendants have been unjustly enriched at the expense of the City.

350.    Manufacturer Defendants' enrichment is unjust and would be unconscionable to retain. The City has sustained and will continue to sustain damages as a direct result of Manufacturer Defendants' failure to recall all their PFAS-containing products. Manufacturer Defendants profited from those sales. These damages necessitate an equitable remedy.

351.    The City asks the Court to award the expenditures saved and the profits obtained by Manufacturer Defendants at the expense of the City as a remedy.

## ELEVENTH CLAIM FOR RELIEF – UNIFORM FRAUDULENT TRANSFER ACT
## (UFTA DEFENDANTS)

352.    The City incorporates all averments in this Complaint as if restated fully herein.

353.    The City seeks equitable and other relief pursuant to the Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001 *et seq.*, against E. I. du Pont de Nemours and

Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively, the "UFTA Defendants").

354.    By 2013, EIDP, Inc., f/k/a E. I. du Pont de Nemours and Company ("Old DuPont"), faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

355.    Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

356.    In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

357.    At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including AFFF, PFOA, and PFOA's chemical precursors.

358.    On information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new

Chemours Board of Directors did not take part in negotiating the Separation Agreement.

359.    In or around July 1, 2015, Old DuPont completed the spin-off of Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

360.    Although many of the details of the Separation Agreement remain hidden from the public, on information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

361.    Additionally, Chemours agreed to assume for itself, and indemnify Old DuPont against, all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

362.    Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

363.    On information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

364.    Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

365.    In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly

formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

366.    Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. On information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

367.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

368.    In May 2024, New DuPont announced plans to further separate into three independent public companies: New DuPont, specializing in healthcare, transportation, and safety; "Electronics," specializing in semiconductors and interconnections; and "Water," specializing in filtration and desalination technologies. New DuPont stated its existing PFAS liabilities would be split pro rata among the three offshoot companies.

369.    On information and belief, Corteva currently holds Old DuPont as a subsidiary.

370.    On information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

371.    On information and belief, through the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacture and sale of its

fluorosurfactant products described herein.

372.    On information and belief, the UFTA Defendants (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due, within the meaning of Tex. Bus. & Com. Code Ann. §§ 24.005, 24.006.

373.    On information and belief, the UFTA Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets out of the reach of parties, including the City, that have suffered injury as a result of the actions as described in this Complaint.

374.    On information and belief, UFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont knew, or reasonably should have known, that Chemours would incur debts beyond its ability to pay as they became due.

375.    The City seeks to void the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold the UFTA Defendants jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

376.    The City further reserves such other rights and remedies that may be available to it as may be necessary to fully compensate the City for the damages and injuries it has suffered as alleged in this Complaint.

**TWELFTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT (ALL DEFENDANTS)**

377.    The City incorporates all averments in this Complaint as if restated fully herein.

378.    Because its response action is ongoing, the City will continue to incur response costs

attributable to PFAS contamination caused by Federal Defendants and AFFF Manufacturer Defendants. The City is entitled to declaratory judgment under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), on the liability of Federal Defendants and AFFF Manufacturer Defendants for response costs that will be binding on any subsequent actions to recover further response costs.

379.    The City is also entitled to declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Texas's Uniform Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code § 37.003, on the liability of all Defendants for future damages and costs necessary to abate continuing PFAS migration and contamination including, but not limited to, future costs to operate and maintain water treatment infrastructure.

380.    Upon entering the declaratory judgment prayed for herein, the Court should retain jurisdiction to grant the City further relief as is necessary and proper to effectuate the Court's declaration, pursuant to 28 U.S.C. § 2202 and Tex. Civ. Prac. & Rem. Code § 37.011.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and each of them, jointly and severally, and grant the City the following relief:

a)    An award to the City of all damages suffered, or that will be suffered, including but not limited to response costs, as a result of Defendants' actions, including, without limitation costs: to assure water quality in compliance with federal MCLs; to sample and analyze water and other media for PFAS; to respond to public inquiries and manage public relations regarding the contamination of its Property with PFAS; to investigate treatment options; to arrange to treat water and other media by installing, operating, and maintaining filtration systems; to increase the frequency of water quality testing and monitoring; to manage and dispose of biosolids and other residuals in alternative and potentially more

expensive ways, such as potential disposal in RCRA Subtitle C hazardous waste landfills; to evaluate, install, operate, and maintain tertiary treatment for wastewater and stormwater effluent; to test for and investigate the presence of PFAS in wastewater effluent and biosolids; to manage PFAS in the municipal separate storm sewer system; manage public relations and public inquiries relating to PFAS contamination of the City's Property; relating to the loss of use and enjoyment of the City's Property and its property rights; and relating to the annoyance, discomfort, and inconvenience caused to the City by Defendants' PFAS releases—in an amount of at least $420,591,734;

b) An award to the City, in an amount to be determined at trial, commensurate to the amount of an order for disgorgement of the profits and savings which were obtained by the unjust enrichment of Manufacturer Defendants through their manufacture and/or distribution and sale of AFFF;

c) A declaration that the Defendants are liable for damages suffered by the City to date, as well as response costs to be incurred by the City in the future to abate PFAS migration and contamination;

d) An order awarding to the City its attorney fees and costs, as provided by law;

e) An order voiding the Chemours Transfers and the DuPont Transfers to the extent necessary to satisfy the City's claims;

f) An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

g) An order imposing a constructive trust over any such proceeds for the benefit of the City;

h) An award to the City of pre- and post-judgment interest, as provided by law; and

i)   An order and award to the City for all such other and further relief, including equitable and declaratory, as the Court deems just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) the City demands a trial by jury on all claims so triable.


Respectfully submitted March 10, 2025.


MARTEN LAW, LLP

By:  */s/ Jessica K. Ferrell*
Jessica K. Ferrell, WA Bar No. 36917*
1191 Second Ave, Suite 2200
Seattle, WA 98101
(206) 292-2600
(206) 292-2601 fax
jferrell@martenlaw.com

By:  */s/ Victor Xu*
Victor Xu, OR Bar No. 223323*
1050 SW 6th Ave, Suite 2150
Portland, OR 97204
(503) 329-6043
(503) 243-2202 fax
vxu@martenlaw.com

LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.

By:  */s/ Jose E. de la Fuente*
Jose E. de la Fuente, TX Bar No. 00793605
816 Congress Ave, Suite 1900
Austin, TX 78701
(512) 322-5800
(512) 472-0532 fax
jdelafuente@lglawfirm.com

CITY OF FORT WORTH

By:  _/s/ Chris Mosley_
Chris Mosley, TX Bar No. 00789505
Senior Assistant City Attorney
Section Chief, General Litigation
City of Fort Worth
100 Fort Worth Trail
Fort Worth, Texas 76102
(817) 392-7603
(817) 392-8359 fax
Chris.Mosley@fortworthtexas.gov

*_Pro hac vice_ applications filed concurrently per LR 83.11.

Attorneys for the City of Fort Worth